# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00554-CR

---

**Lashai Jean-Baptiste, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 27TH DISTRICT COURT OF BELL COUNTY
### NO. 79220, THE HONORABLE JOHN GAUNTT, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A jury found appellant Lashai Jean-Baptiste guilty of aggravated assault with a deadly weapon and assessed her punishment at two years' confinement. *See* Tex. Penal Code §§ 22.01(a)(2), .02(a)(2). In accordance with the jury's recommendation, the trial court suspended appellant's sentence and placed her on community supervision for a period of five years. *See* Tex. Code Crim. Proc. art. 42A.055. In three issues, appellant contends that her trial counsel was ineffective for failing to request a defense-of-property instruction, that the trial court violated her right to due process by failing to consider the full range of punishment when determining the length of her community supervision, and that "her term of community supervision is stayed pending a determination of whether she has been finally convicted." We modify the trial court's judgment

of conviction nunc pro tunc[1] to correct the spelling of appellant's name and affirm the judgment as modified.

## BACKGROUND

This case arose from a confrontation in May 2018 between appellant, who was then twenty-two years old, and three people hired by her stepfather, Rhadames Vila, to do yardwork at the house in Killeen in which he had lived with appellant's recently deceased mother. The three people included Patricia Robert, Vila's girlfriend; Marilyn Bassy, Robert's cousin; and Victor Bassy, Marilyn's husband. The State alleged that appellant threatened Robert with imminent bodily injury and used or exhibited a firearm during the commission of the offense.[2] At trial, the State's witnesses included Robert, the Bassys, Vila, his neighbor, members of law enforcement, and an animal-control officer. Appellant testified in her case-in-chief.

Robert testified about the charged assault and the circumstances surrounding it. On May 26, Robert—who had recently begun dating Vila—and the Bassys were doing yardwork at Vila's house to prepare it for sale; Vila, who was running an errand, was aware of their presence. Robert and Marilyn were picking up branches, and Victor was preparing to cut down a tree with a chainsaw. At the time, Robert had not met appellant. Robert testified that Vila lived in the house "[w]ith others" and that appellant was "in and out."

---

[1] The trial court issued a judgment nunc pro tunc on August 15, 2024, to correctly reflect appellant's plea of not guilty.

[2] Two unadjudicated charges of aggravated assault with a deadly weapon were considered by the trial court during sentencing pursuant to section 12.45 of the Penal Code. *See* Tex. Penal Code § 12.45 (providing that, with State's permission, defendant may admit guilt to one or more unadjudicated offenses during sentencing hearing and that, if court takes admitted offense into account in determining sentence for charged offense, prosecution is barred for admitted offense).

Appellant and a man, whom appellant identified at trial as her then-boyfriend, arrived at the house in a vehicle, and appellant told Robert and the Bassys that they were trespassing on appellant's property and had to leave. Appellant entered the house, and Robert called Vila and told him what was happening; he said that she "didn't need to go [any]where" and that he was headed home. Appellant exited the house through the garage with her two dogs and yelled "awful foul language" at Robert and the Bassys, who asked appellant to control her dogs. Robert told appellant that Vila had invited her and the Bassys to the house, that he would return shortly, and that appellant could call him for confirmation. Appellant "didn't care" and "wanted [them] off the property."

There was some confusion in Robert's testimony as to what happened next. She first testified that appellant, after going to her vehicle to get a gun, approached Robert and Marilyn, who were on the front porch, and pointed the gun at their faces from a distance of around six-to-eight feet. Robert was afraid, and appellant told them she was going to "take [them] out," "kill" them, and "shoot" them. On cross-examination, however, Robert testified that appellant had the gun when she came out of the house: "She comes back outside and stands in front of me and my cousin and started cussing us out and telling us we need to leave. And she pulled a gun on us."

At some point, Victor started to cut down the tree, and appellant yelled at him to stop. Her dogs ran at him and bit him on the legs. When he threatened to "cut the dogs with the saw," she put a gun to his head and said that he "wasn't going to cut her dogs." He was able to escape from the dogs by kicking and by swinging the chainsaw. The police were called, and appellant left with her dogs and the gun before they arrived.

Like Robert, Marilyn and Victor testified regarding the confrontation on May 26. Marilyn testified that when appellant exited the garage with her dogs, they ran toward Victor and

3

attacked him. He swung the chainsaw only after they tried to bite him. According to Marilyn, appellant screamed, "Don't kill my dogs," ran to her car, and retrieved a gun; she told Victor, "[I]f you kill my dogs, I'm going to kill you." Marilyn testified that appellant might have said that the house was her property, but Marilyn could not remember if appellant asked them to leave. Marilyn also testified that appellant left after her boyfriend, whom Marilyn did not see do anything, begged appellant to get into the car. Asked whether appellant had pointed the gun at Marilyn and Robert, Marilyn further testified that "she pointed it toward us like that (indicating), but really toward my husband." Marilyn added that appellant had waved the gun back and forth; that its barrel had swung past Marilyn; and that although she had been scared, appellant had threatened only Victor with the gun.

Victor testified that appellant warned him he should not be on her mother's property. He responded that Vila had asked him to cut down trees and that he would not leave unless directed to by Vila. Victor thought that the incident was over when appellant went inside, but she then released her dogs, which attacked him. One of the dogs bit him, and he told her to restrain it before he used the chainsaw to cut off its head. Although he had not seen her get the gun, she pointed it at him from a few feet away and replied that she would kill him if he hurt her dogs. He testified that appellant pointed the gun only at him. He also testified that his threat to kill the dog "was a lie," that he did not "fight the dog," and that he turned off his chainsaw when the dog bit him. He exited the yard through a gate and called the police. Because he was bitten, he had to receive rabies shots at the hospital.

4

Vincent White, Vila's neighbor, testified that appellant and her brother Francois[3] had grown up next door, that their mother died around six months before the charged offense, and that appellant was still "pretty upset" about her mother's death at the time of the offense. White testified that while in his backyard, he heard an argument between "a young lady and a guy that was trimming trees"; when he looked, White saw that a dog was attacking the landscaper and that appellant was brandishing a gun, holding it above her shoulder and waving it around, and threatening to shoot the landscaper. White did not hear the landscaper threaten to kill appellant's dog; rather, the man was "just kind of wielding the chainsaw towards the dog so the dog wouldn't bite him."

Vila testified about appellant's living situation and his understanding of what had occurred between appellant and the Bassys and Robert, whom he testified was his girlfriend and who had lived with him at the time of the offense. Vila and his wife, who passed in November 2017, bought the Killeen house together in 2004 or 2005; their names were on the deed and the promissory note for the mortgage. Appellant, Vila's stepdaughter, had lived in the house until she left for college before her mother's death. Although appellant had a room in the house and in May 2018 had a key,[4] she did not live there at the time of the offense; she had left her dogs with Vila in 2017, and he would see her every two or three weeks when she would let them out, stay for a little while, and "disappear." He told her of his intention to sell the house, and two weeks before the offense, she collected half of her things and told him that she was getting married and moving to Louisiana.

---

[3] Francois was not at the house on May 26, 2018.

[4] Vila testified that he changed the locks after the offense.

Vila hired the Bassys to do yardwork on May 26. While Vila was on his way home from church, Robert called him to report that appellant was at the house and was "acting crazy." Robert told him that appellant had pulled a gun on her and that appellant's dog had bitten Victor. When he arrived at the house, appellant was leaving and told Vila—who is from Puerto Rico—"I'm going to send you back to Puerto Rico in a body bag."

Bell County Sheriff's Office patrol supervisor Jeffrey McKenzie, who in May 2018 was a patrol deputy, testified to the content of a recorded conversation he had with appellant after the confrontation on May 26 and after two additional incidents in which appellant had gone to the house in Killeen. Appellant told McKenzie that the house was her mother's and that someone had trespassed on the property. She explained that her actions resulted from her being upset that Vila had a girlfriend so soon after her mother's death and that his girlfriend was at the house. McKenzie agreed that appellant appeared to be "pretty upset about her mother" and testified that she showed him a valid concealed-carry permit.

Appellant testified about her connection to the Killeen house and about the events of May 26. She and Francois had grown up in the house; appellant kept her dogs and belongings there and would check on her dogs every day when she was in town. The tree that Victor had been preparing to cut down[5] was special to appellant because her mother—who in 2017 passed away from an illness at only fifty years old—had planted it and because one of appellant's dogs had a "special bond" with it. Appellant's understanding was that because her mother had died without a will, the house was "community property" and on her mother's death "became [appellant's] and

---

[5] Appellant agreed that Victor "was tending to a tree and appeared to be cutting some tree limbs."

[Francois's] portion of her property as well." Appellant did not want Vila to sell the house "in particular" but had not discussed the house with him and was unaware that he intended to sell it.

Although "[e]verything was fine" between appellant and Vila at the time of the offense, her relationship with Robert was more complicated. Appellant testified that she had never met Robert before May 26. However, she also testified that she believed Robert had been involved in the disappearance of family heirlooms and china from the house; that appellant warned Vila about Robert in February 2018; and that in the weeks before the offense, appellant and her boyfriend entered the house late at night and slept there but did not encounter Robert—whom appellant testified Vila must have snuck out of the house the following morning.

Appellant went to the house with her boyfriend around 11 a.m. on May 26 to pick out an outfit for a date. She testified:

> I pulled into the driveway and I see three people I had never met before. And I asked them to get off the property. And I guess Patricia, she shook my hand and she was like, I'm Patricia. And I said, well, I'm Lashai. Thank you. And can you please leave the property. And she told me, no, we're not going anywhere. And I just left her in the front door.

When appellant entered the house, she saw that some things were "out of order" and others, which belonged to her and Francois, were missing. She let her dogs out through the garage and then went to her room and grabbed the outfit and a gun. She took the gun because the family heirlooms and china had already gone missing, and she was also carrying important personal items. While she was in her room, her boyfriend came in and told her that her dog was "going out of control"; she "immediately ran outside to deescalate the situation."

After first putting her belongings in her car, appellant attempted to restrain her dog but was unable to pull it away from Victor. She repeatedly asked him to put down his garden

7

shears,[6] but he refused and almost hit her with them, so she went to her car and retrieved a gun.[7] She agreed that she did so because he had threatened to cut off the dog's head with the shears, and she wanted to protect both herself and her dogs. She testified that during their initial interaction, Victor had come toward her with his "weapon" and had moved "closer and closer." She pointed the gun at him, and he asked her if she was going to kill him over a dog. She "told him yes," and he backed up and left the property. At her boyfriend's suggestion, she closed the gate to the yard.

Appellant denied pointing the gun at Robert, testified that she pointed it only at Victor, and agreed that it was used "only by the tree, in the yard near where the situation was with the dog." Asked if appellant was "contend[ing] that Robert was lying" about appellant pointing a gun at her, appellant responded, "Yes, I am contending [that] to the utmost." Similarly, appellant agreed that "it was a grand conspiracy, that all of these people came up with a story about [her] pointing a gun at everybody's head[s]."

According to appellant, Robert called Vila "at the very end of the incident" after appellant had already gotten into her car. Appellant waited until he got home, but when she tried to talk to him, he pointed at her and said, "I'm calling the police and you're going to jail." She cursed at him and drove away before police arrived because she "didn't want to talk to them while they were there. It was too heated . . . . [She] needed to cool down." She denied threatening to put Vila in a body bag.

---

[6] Appellant testified that she did not recall seeing a chainsaw.

[7] It is unclear from the record why this was necessary given that appellant testified she had taken a gun from her room. She testified that she owned two guns. Yet after testifying that she retrieved a gun from her car, she then testified that there had not been a gun in the car; rather, one of the guns was kept at the Killeen house and the other was stored in her aunt's house.

The jury found appellant guilty. Verbally and in the trial court's punishment charge, the court instructed jurors that "the duration of the period of community supervision will be determined by the Court. It may not be for a period longer than 10 years, nor a period shorter than two years." Defense counsel likewise argued in closing that it "would be up to the [j]udge as far as the length of probation."[8] The jury assessed appellant's punishment at two years' confinement and recommended that her sentence be suspended and that she be placed on community supervision.

At a hearing three months later on August 1, 2024, the trial court and parties expressed confusion over whether the trial court or jury was to determine the length of the community-supervision period as well as over how long it could be. Specifically, there was confusion as to whether the minimum probation term was two years or five years, and the trial judge went off-record after expressing a willingness to be "schooled."

When the record resumed, the trial court read victim-impact statements. The State did not recommend a specific length of community supervision, and defense counsel asked the trial court "to consider probating the jury sentence for a period of two years under all the circumstances." The court sentenced appellant in accordance with the jury's verdict and placed her on community supervision for a period of five years. This appeal followed.

---

[8] The terms "community supervision" and "probation" may be used interchangeably. *See Shortt v. State*, 539 S.W.3d 321, 322 n.1 (Tex. Crim. App. 2018).

9

## DISCUSSION

### I.     Ineffective Assistance of Counsel

In appellant's first issue, she contends that trial counsel was ineffective for failing to request a jury instruction on defense of property.  Specifically, she argues that she lawfully possessed the land on which the offense occurred, reasonably believed Robert and the Bassys were trespassing, admitted the charged conduct, and used reasonable force.  Citing the Court of Criminal Appeals' decision in *Vasquez v. State*, she asserts that because counsel failed to request a defense-of-property instruction, "the jury had no vehicle with which to acquit" her and that, consequently, "[n]o reasonable trial strategy can account for failure to request the instruction[]." *See* 830 S.W.2d 948, 951 (Tex. Crim. App. 1992).  The State responds that appellant has failed to prove both deficient performance and prejudice and that *Vasquez* is distinguishable because appellant "had a much stronger defense centered around the idea that [a]ppellant had never threatened Ms. Robert[] with a gun which would have been compromised by also asserting a defense of property defense."

To establish ineffective assistance of counsel, an appellant must demonstrate by a preponderance of the evidence both deficient performance by counsel and prejudice suffered by the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Miller v. State*, 548 S.W.3d 497, 499 (Tex. Crim. App. 2018).  The appellant must first demonstrate that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 687–88; *Ex parte Scott*, 541 S.W.3d 104, 115 (Tex. Crim. App. 2017).  The appellant must then show the existence of a reasonable probability—one sufficient to undermine confidence in the outcome—that the result of the proceeding would have been different absent counsel's deficient performance. *Strickland*, 466 U.S. at 694; *Burch v. State*, 541 S.W.3d 816, 820 (Tex.

10

Crim. App. 2017). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700; *accord Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010).

Appellate review of counsel's representation is highly deferential; we must "indulge in a strong presumption that counsel's conduct was not deficient." *Nava v. State*, 415 S.W.3d 289, 307–08 (Tex. Crim. App. 2013); *see Strickland*, 466 U.S. at 689. To rebut that presumption, a claim of ineffective assistance must be "firmly founded in the record," and "the record must affirmatively demonstrate" the meritorious nature of the claim. *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). Rarely will the trial record by itself be sufficient to demonstrate an ineffective-assistance claim. *Nava*, 415 S.W.3d at 308; *see Prine v. State*, 537 S.W.3d 113, 117 (Tex. Crim. App. 2017) (observing that "record on direct appeal is generally insufficient to show that counsel's performance was deficient"). If trial counsel has not been afforded the opportunity to explain the reasons for his conduct, we will "'assume a strategic motive if any can be imagined,'" *Okonkwo v. State*, 398 S.W.3d 689, 693 (Tex. Crim. App. 2013) (quoting *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005)), and will not find counsel to be deficient unless the challenged conduct was "'so outrageous that no competent attorney would have engaged in it,'" *Nava*, 415 S.W.3d at 308 (quoting *Menefield*, 363 S.W.3d at 593); *see also Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012) ("The mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of counsel.").

Failure to request a jury instruction on a defensive theory can constitute ineffective assistance of counsel. *Browne v. State*, 483 S.W.3d 183, 188 (Tex. App.—Austin 2015, no pet.).

11

"To demonstrate deficient performance based on the failure to request a jury instruction, an appellant must show that he was entitled to the instruction." *Navarro v. State*, 623 S.W.3d 97, 113 (Tex. App.—Austin 2021, pet. ref'd); *see Cardenas v. State*, 30 S.W.3d 384, 392 (Tex. Crim. App. 2000). Trial counsel's failure to request an instruction which is inapplicable, inappropriate, or to which an appellant was not entitled is not ineffective assistance. *See Cummings v. State*, 401 S.W.3d 127, 132 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd); *Aldaba v. State*, 382 S.W.3d 424, 432 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd); *see also Vasquez*, 830 S.W.2d at 950 n.3 ("[J]ust because a competent defense attorney recognizes that a particular defense *might* be available to a particular offense, he or she could also decide it would be inappropriate to propound such a defense in a given case."). Even when a defendant is entitled to a certain instruction, trial counsel may be not ineffective for failing to request it "because defensive issues 'frequently depend upon trial strategy and tactics.'" *Okonkwo*, 398 S.W.3d at 697 (quoting *Tolbert v. State*, 306 S.W.3d 776, 779–82 (Tex. Crim. App. 2010)).

Defense of property—codified in section 9.41 of the Penal Code—is a justification or "confession and avoidance" defense.[9] *See Alonzo v. State*, 353 S.W.3d 778, 782 (Tex. Crim. App. 2011) ("An assertion of a Chapter 9 justification defense is an assertion that the defendant's actions were justified."); *Barron v. State*, 629 S.W.3d 557, 564 (Tex. App.—Eastland 2021, pet. ref'd) ("Justification defenses are based on the common law doctrine of confession and

---

[9] Section 9.41 provides that "[a] person in lawful possession of land or tangible, movable property is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to prevent or terminate the other's trespass on the land or unlawful interference with the property." Tex. Penal Code § 9.41. "The threat of force is justified when the use of force is justified," and "a threat to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force." *Id.* § 9.04; *cf. id.* § 9.42 (governing use of deadly force to protect property).

12

avoidance."); *see also Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007) (equating "confession-and-avoidance" and "justification" defenses and explaining that latter is "'one that defines conduct otherwise criminal, which under the circumstances is socially acceptable and which deserves neither criminal liability nor even censure" (quoting Wayne LaFave, *Substantive Criminal Law* § 9.1(a)(3) at 7 (2d ed. 2003) (internal quotes omitted))); *cf. Rodriguez v. State*, 392 S.W.3d 859, 860–61 (Tex. App.—Amarillo 2013, order) ("A section 9.42 defense of property instruction is, on its face, a confession-and-avoidance or 'justification' type of defense."). To show entitlement to such a defense, a defendant must admit the charged conduct, including both the act or omission and the requisite mental state. *See Rogers v. State*, 677 S.W.3d 705, 714 (Tex. Crim. App. 2023); *Gamino v. State*, 537 S.W.3d 507, 512 (Tex. Crim. App. 2017); *Juarez v. State*, 308 S.W.3d 398, 404 (Tex. Crim. App. 2010). "Admitting to the conduct does not necessarily mean admitting to every element of the offense." *Gamino*, 537 S.W.3d at 512. Rather, the defendant is required to show only that entitlement to the defensive instruction was raised by defensive evidence and that the defendant made a prima facie case for the defense. *See Rogers*, 677 S.W.3d at 714–15; *Shaw*, 243 S.W.3d at 659.

Trial counsel could have reasonably concluded that appellant did not admit to the charged conduct because she testified that she pointed the gun only at Victor and only when she was near the tree. She expressly denied pointing the gun at Robert, the victim of the charged offense, who the evidence showed was on the house's front porch; called Robert a liar for testifying that appellant pointed a gun at her; and agreed that there was a "grand conspiracy" to concoct a story that she pointed the gun "at everybody's head[s]." No defensive evidence showed that appellant pointed the gun at Robert, much less that she did so intentionally or knowingly. *See Juarez*, 308 S.W.3d at 404 (confession-and-avoidance doctrine "requires an admission to the

13

conduct, which includes both the act or omission and the requisite mental state"); Tex. Penal Code § 22.01(a)(2) (person commits assault if she "intentionally or knowingly threatens another with imminent bodily injury").

Appellant argues in her brief that she admitted to the charged conduct by testifying that she pointed the gun at Victor:

> Jean-Baptiste did not have to admit that she pointed a gun at Patricia Robert. She was not charged with pointing a gun at Patricia Robert. She was charged with intentionally or knowingly threatening Patricia Robert with imminent bodily injury . . . . Jean-Baptiste certainly admitted to the nature of her conduct and the circumstances surrounding her conduct. Merely displaying a firearm without pointing it can constitute threat of imminent bodily injury.

Yet trial counsel would not have been unreasonable for refusing to urge such a theory as the basis for appellant's entitlement to a defense-of-property instruction. We have found no case in which a defendant was convicted of aggravated assault with a deadly weapon when the evidence showed that the defendant pointed a gun only at someone other than the victim named in the indictment, did not verbally threaten the named victim, and was not near the named victim when using or exhibiting the gun. The three cases cited by appellant—none of which is binding on this Court or involves a justification defense—are distinguishable. In *Tidwell v. State*, the court of appeals concluded that the evidence was sufficient to support a finding that the defendant threatened the victim with imminent bodily injury because while holding a revolver, she told him that she would shoot him if he did not leave. *See* 187 S.W.3d 771, 773, 775 (Tex. App.—Texarkana 2006, pet. struck). In *Gaston v. State*, our sister court concluded that the evidence was sufficient for a factfinder to find that the defendant "used" a deadly weapon to assault the victim where he entered the walk-in freezer she was inside of while holding a shotgun at his side, clamped his hand over her mouth, and told her to "hush." 672 S.W.2d 819, 820–21 (Tex. App.—Dallas

14

1983, no pet.). And the reviewing court in *Alexander v. State* concluded that the trial court could have rationally inferred that the defendant used or exhibited a pistol in furtherance of a threat given that the defendant was holding a pistol at his side, stood two feet away from the victim, and accused the victim, in a "[d]ense" tone, of having said that he was glad the defendant had been "locked up." *See* No. 14-09-00574-CR, 2010 WL 1992829, at *1, *3 (Tex. App.—Houston [14th Dist.] May 20, 2010, pet. ref'd) (mem. op., not designated for publication). The defendant then left the store, returned while carrying the pistol with his "finger in the trigger guard," and knocked the victim unconscious. *Id.* at *1. Unlike the present case, all three cases involved threats addressed to the victim of the charged offense and either a verbal threat to shoot the victim or physical contact with the victim while holding a firearm.

This case is likewise distinguishable from *Vasquez*, in which a defendant who had been charged with unlawful possession of a firearm by a felon testified that he was kidnapped while serving a prison sentence; that he managed to grab a gun and escape from his kidnappers; and that he was subsequently arrested.[10] *Vasquez*, 830 S.W.2d at 950. The Court of Criminal Appeals stated that counsel should have recognized that the defendant had "nothing to lose by requesting a defensive instruction" on necessity and that without the instruction, the defendant's conviction was a "foregone conclusion." *Id.* at 951. In a footnote, the court noted that counsel "failed to conduct any independent investigation into the facts"; "had not fully researched the law regarding the offense"; had a "total lack of awareness about which defenses, if any, were available to his client"; "advised the trial court that his presentation of a defense came from appellant's

---

[10] The defendant was a "building tender" who was permitted to reside outside of the prison walls and who was kidnapped from a hospital. *Vasquez v. State*, 830 S.W.2d 948, 950 (Tex. Crim. App. 1992).

research in Corpus Juris"; and failed to offer evidence of the kidnapping after the State's attorney opened the door to the evidence in cross-examination. *Id.* at 951 n.4.

Here, even if appellant had been entitled to a defense-of-property instruction, her guilt was not a foregone conclusion in the instruction's absence, and trial counsel had a valid defensive theory that he argued in closing. Counsel, who had secured the inclusion in the charge of instructions on the lesser-included-offenses of deadly conduct and assault, argued that the State had failed to prove beyond a reasonable doubt that appellant threatened Robert with the gun. Counsel emphasized inconsistencies in Robert's testimony, underscored evidence that the gun was involved only "in protection of the animals" and that Robert was not near appellant when she brandished the gun, and asserted that appellant was a more credible witness than Robert. As counsel explained, "[Appellant] didn't threaten Ms. Robert with her gun. She intervened with respect to these dogs . . . . [W]e don't think it's close with regards to proof beyond a reasonable doubt of a threat to Ms. Robert." Counsel suggested that the jury could find appellant guilty of deadly conduct if it believed she had been reckless.

As a justification defense, a defense-of-property instruction would have been incongruous with trial counsel's theory that the State had failed to meet its burden of proof on every element of the charged offense. *See Shaw*, 243 S.W.3d at 659 (explaining that justification defense "does not negate any element of the offense" but "only excuses what would otherwise constitute criminal conduct" and reasoning that defendant was "not entitled to a defensive instruction with respect to evidence that does nothing more than negate an element of the offense"); *see also Wert v. State*, 383 S.W.3d 747, 756 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (determining that defendant had not established that trial counsel was deficient for failing to request defense-of-property instruction because counsel's strategy—"to claim [defendant]

16

accidentally pushed his girlfriend in an attempt to retrieve his shoes"—was "inconsistent with asserting a defense of property," which "involves an intentional use of force to recover one's property"); *cf. Okonkwo*, 398 S.W.3d at 697 (concluding that "counsel was not objectively unreasonable by failing to request an instruction on mistake of fact because that theory was inconsistent with a theory that counsel advanced at trial, and it would have misled the jury as to the State's burden of proof").

On this record, we conclude that appellant has failed to show that counsel's performance was so outrageous that no competent attorney would have engaged in it. *See Nava*, 415 S.W.3d at 308. This is all the more so given the strong presumption against counsel's deficiency, the fact that defensive issues are frequently matters of trial strategy and tactics, and a competent counsel's discretion to reject available defenses as inappropriate. *See id.* at 307–08; *Okonkwo*, 398 S.W.3d at 697; *Vasquez*, 830 S.W.2d at 950 n.3; *see also Marlow v. State,* 886 S.W.2d 314, 318 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd) ("The theories of defense to be included in the jury charge generally fall within counsel's wide latitude to make strategic and tactical decisions . . . . Trial counsel may pursue one reasonable defensive theory and exclude others; this is within his constitutionally protected independence under *Strickland.*"). Because we conclude that appellant has failed to show that counsel was deficient, we need not address the prejudice prong. *Strickland*, 466 U.S. at 700; *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) ("An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong."). We overrule appellant's first issue.

**II.     Failure to Consider Full Range of Community-Supervision Period**

In her second issue, appellant contends that the trial court violated her right to due process by failing to consider the full available range of time for her community-supervision period.  Referencing the discussion between the trial court and the parties at the hearing in August 2024, she posits that the State convinced the court that "the minimum term of community supervision that could be assessed was five years."  The State argues that appellant has failed to overcome the presumption of regularity in court proceedings, that the record shows the trial court was aware of the permissible range for the duration of her community supervision, and that "there is clearly insufficient evidence in this matter to establish clear evidence of bias on the part of the trial court."

"A court's arbitrary refusal to consider the entire range of punishment constitutes a denial of due process."  *Grado v. State*, 445 S.W.3d 736, 739 (Tex. Crim. App. 2014); *see Ex parte Brown*, 158 S.W.3d 449, 456 (Tex. Crim. App. 2005).  "However, a trial court may consider non-arbitrary factors, and we presume that the trial court considered the full range of punishment absent evidence to the contrary."  *Jacobs v. State*, 720 S.W.3d 217, 220 (Tex. App.—Eastland 2025, no pet.).  The trial court is not required to state expressly that it considered the full range of punishment before assessing punishment.  *Id.* at 223.

The Court of Criminal Appeals has noted in dicta that "the prevailing weight of decisional authority in our state suggests that ordinary community supervision is punishment."  *Shortt v. State*, 539 S.W.3d 321, 325 & n.6 (Tex. Crim. App. 2018); *see Green v. State*, 706 S.W.2d 653, 656 n.5 (Tex. Crim. App. 1986) (recognizing "that probation, substantively, is a type of punishment").  We therefore assume without deciding for purposes of

this appeal that the trial court's failure to consider the full range of time for which appellant was eligible to be placed on community supervision would have violated her due-process rights.

Relatedly, although cases in this area of law are almost uniformly concerned with the potential for bias and partiality, *see Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006) (characterizing challenged judicial comments as "clearly distinguishable from those cases where appellate courts have found either partiality of the trial judge or that the trial judge imposed a predetermined sentence"), the Court of Criminal Appeals has at least implicitly recognized that an appellant may allege a due-process violation arising from a judge's *mistake* at to the proper range of punishment, *see Grado*, 445 S.W.3d at 740. In *Grado*, the appellant conceded that the sentencing judge "was not biased *per se*, but rather mistaken as to the proper range of punishment." *Id.* The Court of Criminal Appeals agreed:

> By all accounts, it appears the judge attempted to conscientiously follow the law and consider the range of punishment for Grado's offense, including continuing his community-supervision term. However, the judge's mistaken belief that the particular possession offense carried a minimum of ten-year's confinement, together with Grado's underlying sentence of ten-years' confinement, resulted in the combined mistaken belief that upon revocation Grado faced a determinate sentence of ten years' confinement. We find the nature of Grado's sentencing does not equate to the intentional and deliberate partiality that infected those judicial proceedings we previously found intolerable.

*Id.* Still, the court concluded that the right the appellant sought to vindicate was "one that is a significant feature of our judicial system" and that "speaks to a broader concern—the integrity of judicial sentencing proceedings." *Id.* at 741.

The issue in *Grado* was whether, after failing to object at trial, the appellant could raise a claim on appeal that the trial court had failed to consider the full range of punishment; the Court of Criminal Appeals held that "the right to be sentenced after consideration of the entire

19

applicable range of punishment is a category-two *Marin* right" and is not procedurally defaulted by inaction. *Id.* at 743.

When reviewing alleged errors like this one, it is important to remember that "[i]t is a cardinal rule of appellate procedure" that we "must indulge every presumption in favor of the regularity of the proceedings and documents in the lower court." *McCloud v. State*, 527 S.W.2d 885, 887 (Tex. Crim. App. 1975); *see Jones v. State*, 77 S.W.3d 819, 822 (Tex. Crim. App. 2002) ("[I]n the absence of evidence to the contrary, this Court presumes the regularity of the trial court's judgment and records."); *Light v. State*, 15 S.W.3d 104, 107 (Tex. Crim. App. 2000) ("The presumption of regularity is a judicial construct that requires a reviewing court, absent evidence of impropriety, to indulge every presumption in favor of the regularity of the proceedings and documents in the lower court."). The appellant has the "heavy burden" of overcoming the presumption of regularity of the judgment and proceedings. *Lee v. State*, 39 S.W.3d 373, 376 (Tex. App.—Houston [1st Dist.] 2001, no pet.). When the record is silent, the presumption is not rebutted. *See Word v. State*, 206 S.W.3d 646, 652 (Tex. Crim. App. 2006) (rejecting appellant's invitation to interpret silent record as raising presumption of noncompliance with statutory requirements); *Frame v. State*, 615 S.W.2d 766, 770 (Tex. Crim. App. 1981) (stating that "where the record is silent, there is a presumption that the procedural rules were complied with"); *Housewright v. State*, 573 S.W.2d 233, 234, 236 (Tex. Crim. App. 1978) (applying presumption of regularity because it did not "affirmatively appear from the record" that statute was violated).

In the present case, because of the jury's recommendation, the trial court was required to suspend appellant's sentence and place her on community supervision "for any period permitted under Articles 42A.053(d) and (f), as appropriate." Tex. Code Crim. Proc. art. 42A.055. As relevant here, the Code of Criminal Procedure provides that in a felony case, the minimum

20

period of community supervision is the same as the minimum term of imprisonment applicable to the offense, and the maximum period of community supervision is ten years for a felony other than a third-degree felony. *Id.* art. 42A.053(d)(1)–(2)(A). As appellant was found guilty of a second-degree felony, the minimum term of imprisonment applicable to the offense was two years. *See* Tex. Penal Code § 12.33(a).

Appellant maintains that the following exchange shows that the trial court mistakenly thought that it had to place her on community supervision for at least five years:

> THE COURT: My reading of [the jury's punishment verdict] is they recommended two years['] probation. Is that everyone's understanding?
>
> THE STATE: Well, it's kind of new to me, Judge. I thought the Court decides how long the probation would be, but the prison sentence that would be probated would be for two years.
>
> THE COURT: The terms and conditions are up to the Court.
>
> THE STATE: Oh, okay.
>
> THE COURT: Not the time.
>
> THE STATE: Does it have to be a minimum five years?
>
> THE COURT: It does. This is confusing.

Against the trial court's brief statement, "It does," the State on appeal emphasizes that the court previously instructed the jury correctly that the court could place appellant on community supervision for two-to-ten years; that the record reflected an off-record discussion of indeterminate duration; and that when trial resumed, defense counsel requested that the court "consider probating the jury sentence for a period of two years" with no correction or suggestion of surprise from the trial court or the State.

21

We agree with the State that the trial court's statement, when viewed against the entirety of the record, is insufficient to overcome the presumption of regularity. As the State notes, there is evidence that the trial court was aware of the proper community-supervision range and provided it in both written and verbal instructions to the jury three months before the hearing at which the contested statement was made. Moreover, the court's remark that it understood the jury to have recommended a period of two years of community supervision would be inconsistent with its almost immediately agreeing with the State that the community-supervision period had to be at least five years. It is also possible that the court might simply have misspoken. And the record is silent as to what occurred off-record as well as how much time passed before the proceeding went back on-record. It is telling that the court's last statement before going off-record was that it was open to being "schooled." It is even more telling that when defense counsel requested two years of community supervision, neither the court nor State expressed an understanding that the requested duration would be three years lower than the permissible floor.

For these reasons, we conclude that appellant has failed to overcome—particularly in light of the record's silence as to what occurred off-record—the twin presumptions of the proceeding's regularity as well as of the trial court's consideration of the full range of punishment. *See Light*, 15 S.W.3d at 107; *Jacobs*, 720 S.W.3d at 220. We overrule her second issue.

III. **Stay of Community-Supervision**

In her third issue, appellant contends that "because [she] has filed a notice of appeal, her term of community supervision is stayed pending a determination of whether she has been finally convicted." She does not allege, however, that there has been any attempt to enforce the

22

terms and conditions of her community supervision, and for that reason, the State argues that the issue is not yet ripe for appellate review. We agree.

Appellant is correct that "a judgment of conviction is not final while the conviction is on appeal" because it is possible that "the trial court's judgment 'could be retroactively vitiated by the mere filing of a . . . notice of appeal.'" *Lundgren v. State*, 434 S.W.3d 594, 598 (Tex. Crim. App. 2014) (quoting *Milburn v. State,* 201 S.W.3d 749, 753–54 (Tex. Crim. App. 2006)). Accordingly, "if a defendant files a timely and effective notice of appeal, that filing stays the commencement of the community-supervision term imposed until appellate mandate has issued affirming the judgment of conviction." *Id.*

But "Texas courts are not empowered to give advisory opinions—a prohibition that extends to cases that are not ripe for review." *Petetan v. State*, 622 S.W.3d 321, 334 (Tex. Crim. App. 2021). The ripeness doctrine protects against interference until a decision has been formalized and its effects have been felt by the challenging parties. *Latson v. State*, 440 S.W.3d 119, 122 (Tex. App.—Houston [14th Dist.] 2013, no pet.). "An issue is ripe when the facts are sufficiently developed so that an injury has occurred or is likely to occur, rather than being contingent or remote." *Petetan*, 622 S.W.3d at 334 (internal quotation marks omitted). "'Thus, the ripeness analysis focuses on whether a case involves uncertain or contingent future events that may not occur as anticipated or may not occur at all.'" *Id.* (quoting *Patel v. Texas Dep't of Licensing & Regul.*, 469 S.W.3d 69, 78 (Tex. 2015)).

Appellant has not asserted, much less offered evidence, that there has been any attempt to enforce the terms and conditions of her community supervision or that such an attempt is likely to occur during the pendency of her appeal. Consequently, her claim contemplates precisely the sort of contingent, uncertain, or remote injury that is not ripe for review in this Court.

*See id.*; *see also Latson*, 440 S.W.3d at 122 ("In determining whether an issue is ripe, we weigh the fitness of the issues for judicial decision against the hardship to the parties of withholding court consideration.").[11]   We therefore overrule her third issue.   *Cf. Anastassov v. State*, 664 S.W.3d 815, 824 n.10 (Tex. Crim. App. 2022) ("We are unaware of any entity's attempt to improperly collect consecutive fines in this case, and therefore any complaint regarding the improper *collection* of fines is not yet ripe for review.").

## IV.    Modification

The judgment form in this case recites appellant's surname as "Jean-Baptist."  At trial, appellant testified that her surname was in fact "Jean-Baptiste, J-E-A-N-B-A-P-T-I-S-T-E," and that the indictment was missing the final "e."  During the guilt-innocence charge conference, the trial court noted that "[t]he name of Baptiste has been corrected on the charge with an E added to the end of it.  I am also making those changes to the indictment by the agreement of the parties to correct the spelling error."[12]  The jury charges and verdict forms reflected the correct spelling of appellant's surname.

Appellate courts have the authority to correct or reform a judgment when the necessary information is available to do so.  *See* Tex. R. App. P. 43.2(b) (authorizing court of appeals to modify trial court's judgment and affirm as modified); *Bigley v. State*, 865 S.W.2d 26,

---

[11] Appellant in effect requests declaratory relief, a procedure that "has no application in criminal proceedings." *Ex parte Williams*, 786 S.W.2d 781, 782 (Tex. App.—Houston [1st Dist.] 1990, pet. ref'd); *see Ex parte Hammonds*, 230 S.W.2d 820, 821 (Tex. Crim. App. 1950) (recognizing that declaratory judgments are not recognized in criminal cases in Texas); *see also Halliburton Energy Servs., Inc. v. Axis Techs., LLC*, 444 S.W.3d 251, 262 (Tex. App.—Dallas 2014, no pet.) ("A declaratory judgment is a remedial measure that determines the rights of the parties and affords relief from uncertainty with respect to rights, status, and legal relations.").

[12] The indictment in the record is unamended.

27–28 (Tex. Crim. App. 1993). Accordingly, we modify the judgment nunc pro tunc in trial court cause number 79220 to reflect that appellant's name is "Lashai Jean-Baptiste." *See Tiscareno v. State*, 608 S.W.3d 434, 443 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) (concluding that "the spelling of appellant's name in the judgment does not accurately comport with the record in this case" and modifying judgment although modification was not requested by either party).

## CONCLUSION

Having overruled appellant's issues on appeal and having modified the judgment nunc pro tunc in trial court cause number 79220 as set out above, we affirm the judgment nunc pro tunc as modified.

_____

Rosa Lopez Theofanis, Justice

Before Justices Triana, Theofanis, and Crump

Modified and, as Modified, Affirmed

Filed: April 3, 2026

Do Not Publish